STATE OF NORTH CAROLINA v. NELSON CALDWELL MONTGOMERY

No. 5

(Filed 7 December 1976)

1. Constitutional Law § 30— testimony obtained by police coercion — admissibility — due process

A denial of due process occurs when the State contrives a conviction by the knowing use of perjured testimony; however, when a witness testifies to facts earlier obtained by coercive police action and all of the circumstances surrounding the alleged coercive acts are before the jury, the requirements of due process are met, and it is then for the jury to determine the weight, if any, to be given to the testimony.

2. Constitutional Law § 30— testimony allegedly obtained by police coercion — admissibility

The testimony of three witnesses who gave incriminating testimony against defendant was not rendered inadmissible on the ground the police coerced the witnesses into giving perjured testimony where the only evidence of police coercion was testimony by each witness that he was questioned by the police several times and on one occasion was told that he could get ten years if he lied, a full disclosure of the alleged coercive police action was before the jury, and under vigorous and searching cross-examination each witness steadfastly asserted the truth of the material facts in his testimony.

3. Constitutional Law § 30— repudiation of statement to police — insufficiency to show knowing use of perjured testimony — effect of alleged coercion by police

The fact that a witness at trial repudiated his prior sworn statement given to police officers was not sufficient, standing alone, to bring into operation the rule regarding the knowing use of perjured testimony; furthermore, the witness's testimony incriminating defendant was brought out on cross-examination in an effort by defense counsel to show that the witness had been coerced by police officers into making a false statement, thereby impugning the credibility of the State's other witnesses, and the alleged coercion of the witness presented only a question of credibility which was for the jury.

State v. Montgomery

4. **Criminal Law § 62— witness's reference to polygraph test — motion for mistrial**

   The trial court did not err in the denial of defendant's motion for mistrial made when a State's witness stated during cross-examination by defense counsel that he had been given a polygraph test where there was no evidence before the jury as to the nature and results of the test, and the trial court allowed defense counsel's motion to strike the testimony and instructed the jury not to consider it.

5. **Criminal Law § 66— in-court identification — reference to perjury by police — conversation with other witnesses**

   A witness's in-court identification of defendant as the perpetrator of a robbery was not rendered inadmissible by the fact that the witness had been told by the police that if he told a lie he could be prosecuted for perjury or by the fact that the witness had talked to other State's witnesses before he agreed to testify.

6. **Criminal Law § 66— in-court identification — opportunity for observation — exhibition of photograph to witness**

   The evidence supported the court's determination that a witness who identified defendant in court had ample opportunity at the crime scene to observe defendant, whom he had known well for some two or three years, that the in-court identification was not based on any suggestion as to defendant's name by the police or by any exhibition of a photograph to the witness, and that the in-court identification was of independent origin based solely on what the witness saw at the time of the crime and on his personal acquaintance with defendant.

7. **Constitutional Law § 29; Jury § 7— exclusion of jurors because of death penalty views — death penalty vacated**

   Defendant's constitutional rights were not violated by the exclusion of jurors because of their views concerning the death penalty in a trial for first degree murder since the death penalty for that crime has been invalidated and the decision of *Witherspoon v. Illinois*, 391 U.S. 510, invalidated only the sentence of death and in no way affected the conviction itself.

8. **Constitutional Law § 29; Jury § 7— jury — cross section of community — exclusion of jurors opposed to capital punishment**

   The exclusion of veniremen who expressed scruples against the death penalty in a prosecution for first degree murder did not violate defendant's right to a jury reflecting a fair and representative cross section of the community.

9. **Criminal Law §§ 98, 128— jurors viewing defendant in handcuffs — motion for mistrial**

   The trial court in a prosecution for first degree murder did not err in the denial of defendant's motion for mistrial made on the ground that some of the jurors viewed defendant in handcuffs while he was being escorted from the separate jail building to the courthouse.

10. **Constitutional Law § 36; Homicide § 31— first degree murder — substitution of life imprisonment for death penalty**

   A sentence of life imprisonment is substituted for the death penalty for a murder committed between the date of the decision of *State v. Waddell*, 18 January 1973, and the effective date of the session law rewriting G.S. 14-17, 8 April 1974.

APPEAL by defendant from *Ervin, J.*, 29 September 1975 Session of CATAWBA Superior Court.

Defendant was charged in separate bills of indictment with the first-degree murder of Kristin Cress Elizabeth Andrews and the armed robbery of Jordan's LeCharolais Steak House. The charges were consolidated for trial and defendant entered a plea of not guilty as to each charge.

The State's evidence tended to show that on the night of 24 October 1973, at about 11:45 p.m., Frederick Roebuck, Mildred Burns, Ann Jarrett and Kristin Cress Elizabeth Andrews, employees of the establishment, and three unidentified customers were in or near the dining area of Jordan's LeCharolais Steak House in Hickory, North Carolina. Ted Richards, a dishwasher, was in the kitchen. Three masked black men, one of whom was armed with a pistol, entered the kitchen through the back door. After a short pause, the men proceeded to the dining area where, by the use of the pistol, they took checks and cash from the cash register amounting to $1,150.00. During the course of this robbery Kristin Cress Elizabeth Andrews was fatally shot by the man who was carrying the pistol. The robbery and killing took place within a period of about three minutes. None of the people in the dining area were able to identify the robbers. However, Ted Richards made an in-court identification of defendant as the man who carried the pistol. Richards' testimony will be hereinafter more fully considered.

The jury returned verdicts of guilty as charged in each case. The trial judge entered a judgment imposing the death penalty on the murder charge and arrested judgment on the verdict of guilty of armed robbery.

*Attorney General Edmisten, by Associate Attorney William H. Boone and Special Deputy Attorney General Myron C. Banks, for the State.*

*James E. Ferguson II, attorney for defendant appellant.*

BRANCH, Justice.

Defendant contends that he was denied his constitutional right by due process by the investigative methods of the police officers who allegedly coerced State's witnesses to give perjured testimony against him. Defendant relies upon a line of cases represented by *Mooney v. Holohan,* 294 U.S. 103, 79 L.Ed. 791, 55 S.Ct. 340. In *Mooney,* the petitioner sought relief under the Federal habeas corpus act alleging that his due process rights were violated because the State knowingly used perjured testimony against him and deliberately suppressed evidence which would have refuted the testimony against him. The United States Supreme Court denied the petition because the petitioner had not exhausted the remedies afforded to him by the State courts. However, defendant relies on this language from *Mooney:*

> ... It [due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

Defendant also cites in support of this contention: *Miller v. Pate,* 386 U.S. 1, 17 L.Ed. 2d 690, 87 S.Ct. 785; *Pyle v. Kansas,* 317 U.S. 213, 87 L.Ed. 214, 63 S.Ct. 177; *Hysler v. Florida,* 315 U.S. 411, 86 L.Ed. 932, 62 S.Ct. 688; *Lisenba v. California,* 314 U.S. 219, 86 L.Ed. 166, 62 S.Ct. 280; *United States v. Swope,* 232 F. 2d 853. The majority of the cases cited by defendant are cases in which relief was sought under the Federal habeas corpus act upon allegations that the State knowingly used perjured testimony *and suppressed this knowledge.* In considering this assignment of error, it must be borne in mind that we are considering the admissibility of testimony obtained by the alleged coercion of a witness rather than a *confession* by an accused obtained by police coercion.

In *People v. Portelli,* 15 N.Y. 2d 235, 205 N.E. 2d 857, a witness gave incriminating testimony against defendant and on cross-examination disclosed that he was taken to a police station

by police officers where he denied any knowledge of the crime. He disclosed his knowledge of the crime only after he was severely beaten and tortured. Defendant contended that this testimony should have been stricken because of the coercive tactics of the police officers in obtaining the witness' statement. Rejecting this contention, the New York Court of Appeals stated:

> . . . [T]he testimony of a witness who, although previously forced to make a pretrial statement, asserts that his testimony at the trial is truthful is for the consideration and appraisal of the jury. (See 3 Wigmore, Evidence [3d ed., 1940], § 315, pp. 230-231.) The requirements of law are met if the fact of such earlier coercion or other official lawlessness is disclosed to the jurors so that they may pass upon the witness' veracity and credibility and determine whether the testimony given in open court is truthful and worthy of consideration.

In *People v. Bradford,* 10 Mich. App. 696, 160 N.W. 2d 373, the Michigan Court of Appeals considered a similar question. There a witness, Payne, implicated defendant as his accomplice in the shooting of two police officers. He also testified as to physical harm inflicted upon him during police interrogations. The court, overruling defendant's contention that Payne's testimony was untrustworthy as a matter of law, stated:

> . . . Witness Payne's testimony was certainly to be considered and weighed with no small amount of suspicion. Yet for the trial judge to exclude it as untrustworthy as a matter of law would result in an invasion of the jury's exclusive and unquestioned province as the trier of fact.

In *People v. Treichel* (1924), 229 Mich. 303, 200 N.W. 950, the fact situation and question raised were very similar to that herein. There the implicating accomplice was slapped into a confession by a sheriff. The Michigan Supreme Court by Mr. Justice Wiest stated on p. 309, 200 N.W. on p. 952:

> "Defendants may not urge the exclusion of the testimony of Howard Long on the ground he was led to confess by trickery, deceit, brutality or promises. He was not on trial. Methods and means employed to get him to confess went to the jury along with his testimony, and it was for the jury to say, under the cir-

cumstances, what weight, if any, they would give to what he said in court."

The jury in the instant case was made aware of the circumstances surrounding and leading to witness Payne's implication of defendant.

. . .

The Georgia Supreme Court considered the question of the exclusion of coerced testimony in the case of *Rawlins v. State,* 124 Ga. 31, 52 S.E. 1. The court, in part, stated:

> . . . Evidence that the officers first obtained information as to his participation in the crime by placing him [the witness] under the influence of fear, and that at the time of the trial he still labored under this fear, would be admissible to go to the jury along with his testimony, in order that they might determine upon the weight to be given it; but neither the improper methods used in obtaining the confession nor the apprehension under which the witness labored during the trial would render him an incompetent witness. . . .

*Accord: Long v. United States,* 360 F. 2d 829; *Adler v. State,* 248 Ind. 193, 225 N.E. 2d 171.

[1]  It is self evident that a denial of due process occurs when the State contrives a conviction by the knowing use of perjured testimony. However, when a witness testifies as to facts earlier obtained by coercive police action and all of the circumstances surrounding the alleged coercive acts are before the jury, the requirements of due process are met. It is then for the jury to determine the weight, if any, to be given to the testimony. *United States v. West,* 170 F. Supp. 200; 3 Wigmore, Evidence § 815 (Chadbourne rev. 1970); Annot., 3 L.Ed. 2d 1991, *Due Process — Perjured Testimony.*

[2]  We apply the above-stated principles of law to the rulings of the trial judge concerning the admission of the testimony of Johnny Ray Shuford, Melvin Dula, Henry Thomas, Jr., and Ted Richards.

The testimony of the witness Johnny Ray Shuford tended to show that he saw defendant at the home of Melvin Dula at about 12:30 p.m. on the morning after the LeCharolais Steak House had been robbed. Jerry Cromwell, Billy Little and Nelson

State v. Montgomery

Montgomery were present. Nelson Montgomery had a stack of money with a rubber band tied around it. He also had a charge card and a piece of paper with LeCharolais Steak House written on it. The witness testified that he heard Nelson Montgomery say that he "had to shoot that bitch." On cross-examination the witness made many contradictory statements about the circumstances under which defendant's statement was made and was very vague as to the time and place. However, he did not change his testimony as to the material facts. The only evidence of police coercion was his testimony that he was questioned several times and on one occasion was told that he could get ten years if he lied.

Melvin Dula testified to substantially the same facts, including the fact that one of the police officers told him that he could get up to ten years if he did not tell the truth.

The strongest evidence against defendant came from the witness Ted Richards. He testified that he recognized the man carrying the pistol during the robbery of the LeCharolais Steak House on 24 October 1973 as a schoolmate and neighbor, Nelson Montgomery. Again the only evidence of police coercion was that police officers questioned Richards on several occasions and once told him that he could get up to ten years if he lied. He stated that he was not scared by this statement. Officer McGuire denied making such statement to any of the witnesses. Richards' testimony was also filled with contradictory and inconsistent statements. Nevertheless, he never changed his trial testimony as to the material facts.

The evidence in this case reveals a tenacious investigation by the police officers but shows little evidence of coercive action against the witnesses, Dula, Shuford and Richards. Even had there been strong evidence of coercion, this record does not disclose that defendant's conviction resulted from the use of known perjured testimony. A full disclosure of the alleged coercive police action was before the jury. Under vigorous and searching cross-examination each witness steadfastly asserted the truth of the material facts.

Under these circumstances, we hold that the evidence was admissible. Evidence of any police coercion or of contradictory statements and withholding of information on the part of the witnesses goes to their credibility. This, of course, is a jury question.

We digress in order to make it eminently clear that we do not approve of any police tactics which include beatings and torture. However, our system of jurisprudence provides safeguards against such acts without affecting the admissibility of allegedly coerced testimony.

[3]   Finally, we consider the admission of the testimony of the State's witness Henry Thomas. When it became apparent that Thomas was hostile to the State, the District Attorney requested that he be allowed to examine the witness in the absence of the jury. The jury was excused and the witness testified that on 30 September 1975, he made a statement to police officers Tucker and Keller of the Hickory Police Department to the effect that in September 1973 he borrowed a .22 six-shot revolver from Tony Wilson. He went to the Two Spots Club in Lenoir, North Carolina, that night and there sold the pistol to Nelson Montgomery for the sum of seventy dollars. He later told Tony Wilson that someone had stolen the pistol. About two weeks later he heard about the girl being killed at the steak house. He admitted that his statement was reduced to writing, signed by him and sworn to before a magistrate. However, he testified that police had his cousin Tony Wilson in custody on two felony charges. Wilson had told them about loaning him the pistol and he (Thomas) at first told the officers that the gun had been stolen. Thereupon, the officers told him that his cousin would be held without bond and asked him if he didn't see Nelson Montgomery on the night he borrowed Wilson's pistol. The officers told him and Wilson to go outside and get a story together. After conferring with Wilson for a few moments, he returned and made the false statement about selling the pistol to Montgomery. He made this statement in order to get Wilson out on bond and Wilson was, in fact, allowed to leave after he signed the statement. The jury returned to the courtroom and in reply to the District Attorney's question, the witness testified that he never saw Nelson Montgomery at a club named the Two Spots Club in Lenoir. The State made no further direct examination of the witness. Defense counsel then proceeded to elicit testimony similar to that set out above concerning the coercion of the witness Thomas by the police officers.

The fact that the witness Thomas at trial repudiated the prior sworn statement given to police officers is not sufficient, standing alone, to bring into operation the rule regarding the knowing use of perjured testimony. *Lott v. United States,* 262

State v. Montgomery

F. 2d 332. Further, it clearly appears that it was a part of defense counsel's trial tactics to show that Thomas had been coerced by the police officers into making a false statement, thereby impugning the credibility of the State's witnesses, Dula, Shuford and Richards. Again the alleged coercion of this witness presented only a question of credibility which was for the jury. *See People v. Portelli, supra; People v. Bradford, supra.*

This record does not permit the conclusion that the defendant has been deprived of his constitutional right to due process by coercive action directed against the State's witnesses.

This assignment of error is overruled.

[4] Defendant assigns as error the failure of the trial judge to grant his motion for mistrial because the witness Richards stated that he had taken a polygraph examination.

Defense counsel had vigorously and repeatedly cross-examined the witness Richards regarding his prior conversations and contacts with police officers. The record discloses the following exchange and ruling during that cross-examination:

A. . . . I did not stay over fifteen minutes. After I talked to McGuire that day, he took me home.

Q. Just Captain McGuire?

A. Yes. Nobody was home when I got home. I can't remember if I talked to Captain McGuire some more before I went to Court to give my testimony in this case. I know somewhere between those dates they took me up to Lenoir and give me a polygraph.

MR. FERGUSON: I move to strike that.

Q. Did you talk to Captain McGuire any more?

COURT: Motion to strike is allowed. Don't consider the last statement of the witness where he went or for what purpose, members of the jury.

MR. FERGUSON: We move for a mistrial.

COURT: Motion is denied. EXCEPTION No. 77.

It is well settled in this jurisdiction that the results of a polygraph test are inadmissible into evidence and that the parties may not be allowed to introduce such results directly or

by indirection. *State v. Brunson,* 287 N.C. 436, 215 S.E. 2d 94; *State v. Foye,* 254 N.C. 704, 120 S.E. 2d 169. However, every reference to a polygraph test does not necessarily result in prejudicial error. *State v. Williams,* 279 N.C. 515, 184 S.E. 2d 282.

In *Foye,* the State offered evidence of the results of a polygraph examination given to defendant Foye which indicated that he told the truth about the charged crime of murder. This testimony implicated the codefendant Williams. The State further offered evidence that Williams was also given a polygraph test on the same day but the result of the Williams test was not offered into evidence. The trial judge instructed the jury to apply this evidence only to the defendant Foye. This Court found the admission of this evidence to be prejudicial error as to defendant Williams because "it was designed to leave the inference that the defendant (Foye) was telling the truth about the whole matter and amounted to informing the jury of the results of the lie detector test."

*Foye* is readily distinguishable from instant case. Here the State did not introduce the evidence upon which the motion for mistrial was based. This came forth after defense counsel had cross-examined the witness for a part of the preceding day and for some length of time on 8 October 1975. There was no evidence before the jury as to the nature of the test, the questions propounded, the answers given or the *result* of the test. Further, when defense counsel's cross-examination unintentionally elicited the one reference to a polygraph test, the trial judge immediately allowed his motion to strike and instructed the jury not to consider the evidence. We assume, as our system for administration of justice requires, that the jurors in this case were possessed of sufficient character and intelligence to understand and comply with this instruction by the court. *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453. We, therefore, cannot say that this one phrase used by the witness in an otherwise responsive answer constituted prejudicial error requiring a new trial.

The trial judge correctly denied defendant's motion for a mistrial.

Defendant contends that his constitutional rights to due process was violated by the action of the trial judge in admitting the identification testimony of Ted Richards.

We have previously addressed defendant's contention that the police coerced the witness into offering perjured testimony. There remains for our consideration the contention that the witness' identification testimony should have been suppressed on the grounds that it was tainted by "police persuasion and suggestion."

When the State offered the identification testimony of Ted Richards, upon defendant's objection, the trial judge excused the jury and conducted a *voir dire* examination as to the admissibility of this evidence.

On *voir dire* Ted Richards testified that he recognized one of the robbers as Nelson Montgomery. He had known Nelson Montgomery for about two years and had played with him and "hung around with him." Montgomery lived right behind his home. He stated that he was able to see Montgomery's face through the stocking which he had over his head and he observed him for a period of about ten seconds while standing about one-half step from him. He also recognized him by his voice and the "way he was built." The witness stated unequivocally that his in-court identification of defendant was based on his observations at the time of the commission of the crime. He admitted on cross-examination that he did not tell the police on the night of the crime that he had recognized Nelson Montgomery but that he did tell his mother, father and brother that morning that he recognized Nelson Montgomery. The reason he did not tell the police officers was that he was scared that someone would hurt him. He talked to the police the next day and he mentioned the name of Nelson Montgomery first. Officer McGuire showed him a photograph only *after* he, Richards, had named defendant as the man he had recognized at the steak house that night. He also admitted that he testified at a preliminary hearing that he could not identify defendant as one of the men who committed the crimes at the steak house. He further admitted testifying that a single photograph of defendant was shown him prior to the time that he made the identification. He said that the statements he made at the preliminary hearing were false and that he made them out of fear.

Officer McGuire testified that the witness Ted Richards told him on 26 October 1973 that Nelson Montgomery was one of the men who robbed the steak house. He had not mentioned a name or shown Richards a photograph before the statement

was made. He attended the preliminary hearing on 13 November 1973 when Richards failed to make an identification. The courtroom was full and about 99% of the people in the courtroom were black. The officer said that Ted's mother had told him that she was afraid for her son because of several "incidents."

Melvin L. Tucker testified that he became Chief of Police in the town of Hickory in August 1974. He talked with Ted Richards in the month of February or March 1975 concerning the crimes committed in the LeCharolais Steak House on 24 October 1973. Richards indicated that he was afraid and did not want to be the only witness. He then made arrangements for Richards to talk to prospective witnesses Dula, Shuford and Roberts on 2 April 1975. After talking with these prospective witnesses, Ted Richards stated that he would testify.

Sgt. T. F. Suddreth, a black police officer, was present during the interview on 2 April 1975. Ted told them what happened at the steak house the night of 24 October 1973, and explained that one of the reasons he had been unwilling to testify was that he did not want to be known as a "Tom," *i.e.,* a traitor to the black cause.

Rosalee Abraham, mother of Ted Richards, testified that she talked with Ted during the early morning hours of 25 October 1973 and he told her that he knew who did the shooting but he did not actually tell her that it was Nelson Montgomery until three or four days later.

At the conclusion of the *voir dire* hearing, Judge Ervin made extensive findings of fact consistent with the testimony above set forth. He thereupon concluded and ruled:

1. That Ted Richards had ample opportunity to observe the defendant, whom he had known well for two or three years;

2. That there is nothing to indicate any suggestion by any person which would color the identification of the defendant;

3. That there were no illegal identification procedures or lineups involving the defendant;

4. That the in-court identification of the defendant is of independent origin, based solely on what Ted Rich-

ards saw at the time of the robbery and on his prior personal acquaintances with and knowledge of the defendant, and does not result from any out-of-court confrontation or from any photograph or from any pre-trial identification procedures suggestive or conducive to mistaken identifications;

5. That there was no evidence of any confrontation or other pre-trial identification procedure so unnecessarily conducive or suggestive as to lead to any possibility of irreparable mistaken identification;

6. That the inconsistent statements made by Ted Richards are proper subjects for cross examination; and may be used to impeach him, but they do not require the Court to suppress his identification testimony and the Court declines to do so;

IT IS, THEREFORE, ORDERED that the evidence of the identification of the defendant by Ted Richards is competent evidence in the trial of this case.

[5, 6] Police procedures which are "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to amount to a denial of due process constitute a recognized ground of attack upon a conviction in a criminal case. *Stovall v. Denno,* 388 U.S. 293, 18 L.Ed. 2d 1199, 87 S.Ct. 1967; *State v. Knight,* 282 N.C. 220, 192 S.E. 2d 283. Defendant argues that the in-court identification by the witness Richards resulted from such unlawful procedures and in support of that argument he contends: (1) that Richards' identification of defendant was based on incriminating information received during a meeting with Dula and Shuford at the police station; (2) that the police had threatened Richards with prosecution for perjury unless he testified against defendant; (3) that Captain McGuire had asked Richards to identify a single photograph of defendant as being the person who had robbed the steak house and had mentioned defendant's name prior to his identification of the photograph; and (4) that Richards' in-court identification could not have an independent origin since he had no opportunity to observe the perpetrator of the crime.

[5] The trial judge found that the officers told Richards that if he told a lie he could be prosecuted for perjury. He also found that Richards talked to other State's witnesses before he

agreed to testify. Both of these findings were supported by the evidence. However, these facts, standing alone, are not "so unnecessarily conducive to irreparable mistaken identification" as to preclude the admission of the identification testimony.

[6]    The trial judge's other findings of fact were adverse to defendant's remaining contentions. There was ample evidence to support all the findings of fact and they are, therefore, binding upon this Court. The findings in turn support the conclusions of law and the trial judge's ruling. *State v. Taylor,* 280 N.C. 273, 185 S.E. 2d 677; *State v. Harris,* 279 N.C. 177, 181 S.E. 2d 420.

The trial judge correctly admitted the challenged testimony.

[7]    Defendant next contends that the trial judge erroneously allowed the State to challenge for cause five veniremen who expressed scruples against the death penalty.

This contention is based wholly on the case of *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770. In light of the holding in *Woodson v. North Carolina,* ____ U.S. _____, 49 L.Ed. 2d 944, 96 S.Ct. 2978, invalidating the death penalty provisions of G.S. 14-17 (Cum. Supp. 1975), defendant's contention requires little discussion. In *Witherspoon* the Supreme Court made it clear that its decision invalidated the sentence of death and in no way affected the conviction itself. *See State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629.

This assignment of error is without merit.

[8]    By his Assignment of Error No. 1 defendant contends that the exclusion of death scrupled veniremen violated his right to a jury reflecting a fair and representative cross section of the community.

This same argument was rejected in the case of *Witherspoon v. Illinois, supra,* in which the United States Supreme Court held:

. . . We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared

State v. Montgomery

to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

In *Bumper v. North Carolina,* 391 U.S. 543, 20 L.Ed. 2d 797, 88 S.Ct. 1788, the Supreme Court restated the rule applicable to this argument:

> In *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [Citations omitted.] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily "prosecution prone" . . . .

*See also State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481.

These cases are clearly dispositive of the argument presented here and we, therefore, overrule this assignment of error.

[9] Defendant argues that the trial judge erred by refusing to grant his motion for mistrial because the jury observed defendant in handcuffs.

The only record evidence concerning this matter is contained in defense counsel's oral motion and the oral reply by the District Attorney. According to defense counsel he observed the defendant as he was brought from the jail to the courthouse. He was handcuffed and he passed within three or four feet of jurors who were standing beside the courthouse steps. The District Attorney replied that the jail and the courtroom were in separate buildings and the handcuffs were on all occasions removed before the defendant entered the courtroom.

In *State v. Tolley,* 290 N.C. 349, 226 S.E. 2d 353, we recently considered the question of whether a defendant was denied due process by reason of the fact that he was shackled in the courtroom during his trial. In a well-reasoned and fully documented opinion by Justice Huskins, the Court concluded that as a general rule a defendant is entitled to appear at trial free from bond or shackles except in extraordinary instances. The opinion contained a full discussion of exceptional circumstances which will allow a trial judge to order defendant to be shackled or restrained during the course of a trial. In deciding that the trial judge did not err under the particular circumstances of that case, the Court said that shackling should be avoided because:

. . . (1) [I]t may interfere with the defendant's thought processes and ease of communication with counsel, (2) it intrinsically gives affront to the dignity of the trial process, and most importantly, (3) it tends to create prejudice in the minds of the jurors by suggesting that the defendant is an obviously bad and dangerous person whose guilt is a foregone conclusion.

We reaffirm the holding and reasoning of *Tolley.* However, it is readily apparent that instant case differs factually from *Tolley.* Here defendant was never shackled or bound while in the courtroom. The only basis upon which the trial judge could have granted a new trial was that the fleeting view of the handcuffed defendant while being transported from the jail to the courtoom may have suggested to some of the jurors that defendant was "an obviously bad and dangerous person whose guilt is a foregone conclusion."

The question of whether a mistrial is required because jurors had an opportunity to see an accused in handcuffs while being escorted from the jail to the courthouse has not been before this Court. However, we find guidance from other jurisdictions.

The Supreme Court of Missouri considered a similar question in the case of *State v. Temple,* 194 Mo. 237, 92 S.W. 869. There the defendant was manacled when he was brought into the courtroom from the jail and was again manacled in the presence of some of the jurors when he was returned to the jail. The restraints were removed during the course of the trial. The Missouri Supreme Court emphatically adopted the general rule

followed by our Court in *Tolley* but modified it with this language:

> " . . . But there is no pretense that the prisoner in this case was shackled during the trial. On the contrary, it clearly appears that he was not in any way deprived of the free and calm use of all of his faculties. We do not, however, intend to be understood as holding that any explanation was due from the officer in charge of the defendant for placing shackles upon him in taking him to and from the courthouse during the trial." All of which is applicable to the facts of this case and conclusively establish that the defendant has no ground of complaint on account of the action of the officer in handcuffing him while bringing him to, and taking him from, the court. . . .

The defendant was observed by three or more jurors for a short time while being transported from the jail to the courtroom in *State v. Jones*, 130 N.J. Super. 596, 328 A. 2d 41. Rejecting defendant's motion for a mistrial, the court stated:

> Defendant's right to be free of shackles during trial need not be extended to the right to be free of shackles while being taken back and forth between the courthouse and the jail. *Commonwealth v. Carter*, 219 Pa. Super. 280, 281 A. 2d 75 (Super. Ct. 1971) ; *Moffett v. State*, 291 Ala. 382, 281 So. 2d 630 (Sup. Ct. 1973) ; *People v. Panko*, 34 Mich. App. 297, 191 N.W. 2d 75 (App. Ct. 1971). It is within the sound discretion of an officer charged with the custody of a person to place handcuffs or shackles on him to prevent escape and to protect public safety while the prisoner is being transported. *State v. Moore*, 257 S.C. 147, 184 S.E. 2d 546 (Sup. Ct. 1971). In *State v. Warriner*, 506 S.W. 2d 103 (Mo. Ct. App. 1974), defendant was removed from the courtroom at the end of the first day of trial in handcuffs and was viewed by the jury outside the courtroom for two or three minutes. Quoting from *United States v. Leach*, 429 F. 2d 956, 962 (8 Cir. 1970), the court held (at 104), "It is a normal and regular as well as a highly desirable and necessary practice to handcuff prisoners when they are being taken from one place to another, and the jury is aware of this."

A contention by defendant that his rights of due process were violated when he was seen handcuffed while being taken

from the jail to the courtroom was summarily disposed of by the Kentucky Court of Appeals in the case of *Donehy v. Commonwealth,* 170 Ky. 474, 186 S.W. 161, with the following language:

> We entertain no doubt that it is within the sound discretion of an officer in custody of criminals, taking into account the nature of the offense charged and the character and disposition of the offender, to place handcuffs on him when he is taken to the court from the jail for trial.

*Accord: McCoy v. State,* 175 So. 2d 588; *State v. Duncan,* 116 Mo. 288, 22 S.W. 699; 21 Am. Jur. 2d, Criminal Law § 240.

This record indicates that some of the jurors may have momentarily viewed defendant in handcuffs while he was being escorted from the separate jail building to the courthouse. It is common knowledge that bail is not obtainable in all capital cases and the officer having custody of a person charged with a serious and violent crime has the authority to handcuff him while escorting him in an open, public area. Indeed, it would seem that when the public safety and welfare is balanced against the due process rights of the individual in this case, such action was not only proper but preferable. Under the circumstances of this case, the trial judge correctly denied defendant's motion for a mistrial.

**[10]**   Defendant next attacks the imposition of the death penalty upon the verdict of guilty of first-degree murder.

In *Woodson v. North Carolina,* ___ U.S. ___, 49 L.Ed. 2d 944, 96 S.Ct. 2978, the United States Supreme Court invalidated the death penalty provisions of G.S. 14-17 (Cum. Supp. 1975). By virtue of the provisions of 1973 Sess. Laws, c. 1201, § 7 (1974 Session), a sentence of life imprisonment is substituted in lieu of the death penalty for crimes of first-degree murder committed *after* its effective date of 8 April 1974. However, in instant case the offense was committed prior to that date. We have held that the appropriate sentence for one convicted of first-degree murder committed *prior* to the 1974 enactment and *after* the interpretation of G.S. 14-17 (1969) in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (decided 18 January 1973), is life imprisonment. *State v. Davis,* 290 N.C. 511, 227 S.E. 2d 97. For the reasons stated in *Davis,* we substitute a sentence of life imprisonment in lieu of the death penalty imposed in this case.

Defendant does not support his remaining exceptions with reason, argument or citation in his brief. However, we have carefully examined this entire record and find no error warranting that the verdict and judgment be disturbed.

This case is remanded to the Superior Court of Catawba County with directions (1) that the presiding judge, without requiring the presence of defendant, enter a judgment imposing life imprisonment for first-degree murder of which defendant has been convicted; and (2) that in accordance with this judgment the clerk of superior court of Catawba County issue a commitment in substitution for the commitment heretofore issued. It is further ordered that the clerk furnish to the defendant and his attorney a copy of this judgment and commitment as revised in accordance with this opinion.

No error in the verdict.

Death sentence vacated.