STATE OF NORTH CAROLINA v. JAVON CAPERS, DEFENDANT

No. COA09-1613

(Filed 21 December 2010)

## 1. Evidence— use of restraints when arrested—admissible

Plain error review was allowed for the unchallenged admission of testimony that defendant was handcuffed and shackled when he was arrested. Defendant challenged the admission of evidence about the use of restraints prior to trial rather than at trial.

STATE v. CAPERS

[208 N.C. App. 605 (2010)]

**2. Evidence— defendant shackled when arrested—admissible**

The trial court did not err by allowing testimony that defendant was handcuffed and shackled when arrested. Such testimony did not have the same effect as a jury seeing defendant in shackles at trial.

**3. Evidence— flight—statement of intent—implicit admission of guilt**

The trial court did not err by admitting testimony from an officer who transported defendant from New York to North Carolina that defendant told the officer that they should have waited until midnight, when defendant would have been gone. Although defendant argued that this was an empty boast rather than evidence of flight, the jury could reasonably have found that defendant's statement was an implicit admission of guilt and as such was relevant.

**4. Evidence— prior incarceration—excluded at defendant's request**

The prejudice from defendant's statement to an officer did not outweigh the probative value where defendant told the officer that he should have waited until midnight, when defendant would have been gone, before picking defendant up in New York for transportation to North Carolina. Although defendant argued on appeal that the jurors were not informed that he would have been released at the end of his New York sentence at midnight, defendant had objected to any testimony that he was incarcerated on unrelated charges in New York.

**5. Evidence— hearsay—present sense impression—50 minutes after shooting—medical treatment**

The trial court did not err in a first-degree murder prosecution by admitting as a present sense impression testimony from the mother of an additional victim that her son had said at the hospital that he had been shot by defendant. The trial court correctly concluded that the testimony was admissible as a present sense impression where the statement was made about 50 minutes after the shooting and the focus of events during that time was on saving the victim's life, thereby reducing the likelihood of deliberate or conscious misrepresentation.

STATE v. CAPERS

[208 N.C. App. 605 (2010)]

**6. Evidence— two-part statement—considered separately**

The trial court did not err in a first-degree murder prosecution by excluding the first part of a statement but admitting the second. The trial court concluded that the first portion of the statement lacked credibility because the witness, who was one of the shooting victims, could not have had personal knowledge of the subject of the first portion of the statement.

Appeal by defendant from judgment entered 30 April 2009 by Judge J. Gentry Caudill in Cleveland County Superior Court. Heard in the Court of Appeals 27 May 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz, for the State.*

*Marilyn G. Ozer for defendant-appellant.*

GEER, Judge.

Defendant Javon Capers appeals his conviction of first degree murder, contending that the trial court erred in allowing testimony that defendant, when arrested, was handcuffed and shackled. Defendant primarily argues this evidence was admitted in violation of *State v. Tolley*, 290 N.C. 349, 365, 226 S.E.2d 353, 366 (1976) (emphasis added), which provides that "a defendant in a criminal case is entitled to appear *at trial* free from all bonds or shackles except in extraordinary instances." Because *Tolley* does not apply to the situation in which a jury is allowed to hear that a defendant was previously handcuffed and shackled when arrested, we hold that the trial court properly admitted this testimony.

Facts

At trial, the State's evidence tended to show the following. On 26 August 1999, Brandon Wilson borrowed a black Dodge Ram truck from Rodney McCloud in exchange for crack cocaine. Wilson, who admitted he might have smoked marijuana that evening, was driving around Shelby, North Carolina at about 5:30 p.m. when he was flagged down by defendant. Defendant asked for a ride to a friend's house, and Wilson agreed. At defendant's direction, Wilson drove to the Lawndale neighborhood to pick up two men: Kendue Brown, also known as "Bumpy," and Santee Coleman. Defendant sat in front with Wilson, while Bumpy and Coleman sat in the back seat.

Wilson then drove to the Light Oak neighborhood to a liquor house. By the time they arrived in Light Oak, it was dark outside. The other three men got out of the truck and spoke to a few men at the liquor house. Wilson stayed in the truck because he was considered "a Shelby person . . . and Shelby people just didn't go into Light Oak at that time for previous beef." After about 20 minutes, defendant told Wilson he wanted to leave and go to one other place.

After all four men were back in the truck, defendant had Wilson drive to the Holly Oak apartments. Defendant wanted to meet a man named Julian Roseboro, also known as "J." Wilson parked the truck in front of the Holly Oak apartments, and all four men got out. Four other men from Light Oak, including Derrick Goodson, also drove to the Holly Oak apartments in a Mercury Cougar. The Mercury Cougar was parked next to a phone booth near the "J" building.[1]

Wilson went over and stood near the phone booth with a group of people, including the men from the Mercury Cougar and some Holly Oak residents. Defendant went directly to the phone booth and began talking on the phone. Wilson stood drinking liquor with some of the men from the Mercury Cougar, but he got tired of waiting. He asked Bumpy to tell defendant, who was still on the phone, that Wilson was leaving. After defendant did not respond when Bumpy gave him the message, Wilson walked up to defendant who put down the phone and asked Wilson to give him 10 more minutes.

At that time, a gray Jeep pulled up, and Roseboro got out. Roseboro walked toward Wilson and defendant and then stopped. Wilson felt that something was wrong, so he started walking away. Defendant looked back at Roseboro and hung up the phone. Defendant pulled out a .9 millimeter gun and asked Roseboro "where his money was at." Although Roseboro lifted up his shirt to show he was not armed, defendant shot Roseboro who collapsed. Then, defendant walked up to Wilson and said, "[L]et's go." Wilson, defendant, Bumpy, and Coleman all got into the truck.

Defendant told Wilson to turn left and drive toward the lower part of the apartment complex, which was a dead end. Some people had run in that direction. Defendant now had two .9 millimeter guns. As Wilson was driving toward the dead end, defendant opened the truck door, stuck his head and arms out of the truck, and started shooting. Wilson "stomped on the brakes," put the truck in reverse, and backed

---

1. All of the buildings in the Holly Oak apartments are named alphabetically.

up. As they were going in reverse, Wilson heard "a whole bunch of shots and [the] window shattered." Coleman yelled, "I'm hit, I'm shot."

Merrill Baker was sitting on his porch talking to Goodson, one of the men from the Mercury Cougar, when they heard the sound of a gunshot coming from the other side of the building. Baker said they did not pay any attention to it at first because "[s]omething was always happening out there." Suddenly, a dark colored truck came around the corner, and a man got partially out of the truck. The man, holding a gun in each hand, started shooting and shot Goodson twice. Baker did not recognize the person shooting from the truck.

Wilson turned the truck around, left the complex, and headed toward the highway. Coleman was yelling, and there was a lot of commotion in the truck. When Wilson eventually pulled off of the highway into the parking lot of a store, Coleman asked to be taken to the hospital. Defendant took out his gun, pointed it at Coleman, and said, "Man, just get out." Coleman got out of the truck and fell down. The other three men drove to Gastonia, about 40 minutes away, where Wilson's sister lived. When they arrived, Wilson went into the kitchen and "just paced" while the other two sat outside. Wilson joined them outside, and after a couple of hours, they headed back to Shelby. Wilson dropped defendant and Bumpy off and returned the truck to McCloud. Defendant immediately went to Charlotte to catch a bus to New York.

At approximately 12:50 a.m., Detective Randy Conner of the Shelby Police Department responded to the crime scene at the Holly Oak apartments. When he arrived, he was motioned by bystanders to go to an area near the "J" building where he found Roseboro lying near the phone booth at the end of the building. Roseboro was on his left side, propped up against a vehicle. There was a large amount of blood coming from Roseboro's chest, but he was still breathing.

Officer Danny Halloran located Goodson, who had been shot in the stomach, lying on the ground by an apartment in the "L" building. Goodson was transported to the hospital. Police also found Coleman at the convenience store where he had been left by Wilson. Coleman told officers he had been shot in the knee at Holly Oak, but he did not know who shot him. He also was transported to the hospital. Both Coleman and Goodson survived their injuries although they later died from unrelated causes prior to the trial in this case.

Roseboro died on 3 September 1999 from multi-organ system failure caused by the gunshot wound. The autopsy revealed that he had

a gunshot graze wound to his left wrist and a gunshot wound to his abdomen. The same bullet could have caused both wounds. The bullet traveled from the left-upper side of the abdomen toward the middle of the body and the back and lodged in the spine, just below the level of the belly button. The bullet removed from Roseboro's body was a Federal hollow point .9 millimeter Luger.

Sergeant Craig Earwood collected evidence at the crime scene. Among other items, he found 14 shell casings in the parking lot at both shooting locations, with the majority of them being found in front of the buildings where Goodson was shot. Only two firearms were responsible for the 14 shell casings. Four of the casings were fired from one .9 millimeter firearm, and the other 10 were fired from a second .9 millimeter firearm. Police also found a bullet hole in the truck driven by Wilson that night.

Wilson was subsequently brought in by police for questioning about the incident. At first, Wilson told the officers that he had been in a shootout, and somebody had tried to rob him. Once he learned that the owner of the truck, McCloud, had given a statement to police, Wilson decided to make up a story to "put [himself] far away from it." He then claimed that he had tried to buy some marijuana at Holly Oak that evening, and, while he was standing there, he saw defendant shoot Roseboro. At trial, he admitted signing a statement to that effect, but testified that he "told the truth to the extent that [he was] at Holly Oak Apartments," but he "did not tell the truth about why [he was] there or what [he] did while [he] was there." Wilson gave another statement on 16 August 2005 that matched his subsequent trial testimony.

An arrest warrant charging defendant with first degree murder was issued on 7 September 1999. On 10 August 2001, an application for requisition of defendant from the State of New York was issued. On 31 March 2004, because defendant could not be found for service of the arrest warrant, the State dismissed with leave the first degree murder charge. On 26 August 2005, defendant waived extradition from the State of New York, and on 29 August 2005, the first degree murder charge was reinstated. Defendant was indicted for first degree murder on 10 October 2005.

At trial, William Hall, an inmate incarcerated with defendant, was called by the State. Hall had written a letter to the district attorney's office on 25 September 2007. In the letter, Hall stated that while they

were incarcerated together, defendant told him what happened on the night of the shooting. The letter largely corroborated the version of events given by Wilson at trial. At trial, however, Hall denied that the letter was true. He admitted that he had visited with defendant's attorney before the trial and that, until trial, he had never indicated to any law enforcement officer or to the district attorney's office that the letter was not true. He further explained, however, that he had been incarcerated with Wilson, and Wilson told him that if he wrote a copy of a letter that Wilson gave him and sent it to the district attorney, that would help get Hall's bond reduced.

Delone Haynes and Kevin Morris, who had been in the Mercury Cougar that night, were uncooperative when they were called to testify. Haynes confirmed only that he had been at Light Oak and then traveled to Holly Oak where Wilson drove up in a truck with three other people. He did not remember seeing defendant, but he remembered that Roseboro was shot near the phone booth and that, afterward, Morris was holding him. Morris remembered the night Roseboro was shot, but had "selective memory" as to the details. He did not remember seeing defendant.

Defendant presented no evidence. He was convicted of first degree murder and sentenced to life imprisonment without parole. He timely appealed to this Court.

I

Defendant first contends that the trial court violated his right to due process by allowing Detective Conner to testify that he shackled defendant when he was arrested in New York. Detective Conner testified that after defendant was extradited to North Carolina from New York, he and other officers drove to New York from North Carolina and prepared defendant for transport back to North Carolina. He explained further:

To prepare Mr. Capers for transport back to Cleveland County, we would have done everything that we normally do. When one officer transfers a suspect or someone over, we always make sure that there's no weapons on that person. Even coming from a jail facility, we do those same things. During this time, I prepared Mr. Capers for transport. In doing that, I placed what's called shackles or leg irons around his ankles. That's to limit the movement from his legs. Also, we used the belly chain. I can't remember the diameter of the chain, but it goes around the waist and then

there's a fitting that fits through the length of the chain, and then it's a pair of standard handcuffs, goes through that link and secures the hands. What it does is it limits the movement from the hands, from any point. It keeps the hands basically towards the center of the body, to limit movement. And I also searched Mr. Capers to make sure he didn't have any weapons or anything on his person.

Defendant did not object to this testimony.

[1] As an initial matter, the parties dispute whether, in the absence of defendant's objection to this testimony, this Court can review this issue for plain error. The State cites cases holding that a defendant's failure to object to a restraint at trial waives that issue for appellate review. *See, e.g., State v. Ash,* 169 N.C. App. 715, 726, 611 S.E.2d 855, 863, *appeal dismissed and disc. review denied,* 360 N.C. 66, 621 S.E.2d 878 (2005). In *State v. Wilds,* 133 N.C. App. 195, 207, 515 S.E.2d 466, 476 (1999), however, this Court applied plain error review to the question whether the trial court erred in admitting a photograph in which the defendant's legs were in shackles. Here, defendant does not challenge the use of restraints at trial (the issue in *Ash*), but rather challenges the admission of evidence about the use of restraints prior to trial (as in *Wilds*). We hold that plain error review applies.

As the Supreme Court has held:

"[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error has 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' "

*State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir.), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513, 103 S. Ct. 381 (1982)).

[2] In arguing that admission of testimony that a defendant was shackled when arrested is constitutionally impermissible, defendant

relies upon the rule set out in *Tolley*, 290 N.C. at 366, 226 S.E.2d at 367 (quoting *Blair v. Commonwealth*, 171 Ky. 319, 188 S.W. 390 (1916)): "[I]n the absence of a showing of necessity therefor, compelling the defendant to stand trial while shackled is inherently prejudicial in that it so infringes upon the presumption of innocence that it 'interfere[s] with a fair and just decision of the question of . . . guilt or innocence.'" *Tolley*, however, dealt with the situation in which the defendant is made to stand trial while wearing shackles. *Tolley* does not address the issue we have here—whether it is constitutionally impermissible to allow the jury to hear testimony that the defendant was shackled when arrested.

In addition to *Tolley*, defendant points to *Wilds*, 133 N.C. App. at 207, 515 S.E.2d at 476, in which the trial court admitted into evidence a photograph of the defendant in shackles when arrested. This Court did not, however, specifically address whether admission of the photograph depicting the defendant in shackles was error, but rather held that, regardless whether any error occurred, the defendant had failed to show sufficient prejudice to establish plain error. *Id.*

In *State v. Montgomery*, 291 N.C. 235, 252, 229 S.E.2d 904, 913-14 (1976), however, the Supreme Court refused to extend *Tolley* to cover the situation in which several jurors momentarily saw the defendant in handcuffs while being taken from the jail to the courthouse. The Court distinguished that case from *Tolley* because the "defendant was never shackled or bound while in the courtroom." 291 N.C. at 250, 229 S.E.2d at 912. The Court concluded: " 'Defendant's right to be free of shackles during trial need not be extended to the right to be free of shackles while being taken back and forth between the courthouse and the jail.' " *Id.* at 251, 229 S.E.2d at 913 (quoting *State v. Jones*, 130 N.J. Super. 596, 599, 328 A.2d 41, 42 (1974)). The Court added:

> This record indicates that some of the jurors may have momentarily viewed defendant in handcuffs while he was being escorted from the separate jail building to the courthouse. It is common knowledge that bail is not obtainable in all capital cases and the officer having custody of a person charged with a serious and violent crime has the authority to handcuff him while escorting him in an open, public area. Indeed, it would seem that when the public safety and welfare is balanced against the due process rights of the individual in this case, such action was not only proper but preferable. Under the circumstances of this case, the trial judge correctly denied defendant's motion for a mistrial.

*Id.* at 252, 229 S.E.2d at 913-14.

In *State v. Fowler*, 157 N.C. App. 564, 566, 579 S.E.2d 499, 500 (2003), the defendant argued that the rule regarding shackling at trial should also apply when the trial court told the jury that the defendant was in the custody of the Wake County Sheriff's Department when explaining the reason for a delay in the proceeding. On appeal, this Court rejected that argument, reasoning that "the statements by the trial court do not create the same prejudice to the defendant as that raised when a defendant appears in court in shackles or prison garb." *Id.*, 579 S.E.2d at 501.

We believe that, given *Montgomery* and *Fowler*, the Supreme Court's decision in *Tolley* should not be extended to testimony that a defendant was shackled when arrested. If the North Carolina appellate courts have found no error when the jury views a defendant in shackles outside the courtroom or when a trial judge tells a jury that the defendant is in police custody, we do not believe there is any error in allowing the jury to hear that a defendant was handcuffed or shackled when arrested.

Just as the Supreme Court concluded that it is common knowledge that a defendant may not be able to post bail and will be transported to trial in handcuffs, it is also common knowledge that when people are arrested, they are handcuffed. *See State v. Smith*, 278 Kan. 45, 49, 92 P.3d 1096, 1099-1100 (2004) (holding that trial court did not err in admitting photographs of defendant in jail clothing because "most jurors would hardly be shocked to learn that a murder suspect was taken into custody for some period of time, the only information communicated by jail clothing"); *State v. Mullin-Coston*, 115 Wash. App. 679, 693, 64 P.3d 40, 48 (2003) (noting that "although references to custody can certainly carry some prejudice, they do not carry the same suggestive quality of a defendant shackled to his chair during trial" and holding that "[j]urors must be expected to know that a person awaiting trial will often do so in custody"), *aff'd*, 152 Wash. 2d 107, 95 P.3d 321 (2004).

We do not believe that the Supreme Court in *Tolley* intended to bar testimony that a defendant was handcuffed or shackled when arrested. Such testimony, consistent with the common knowledge of jurors, does not have the same effect as a jury observing a defendant in shackles at trial. We, therefore, overrule this argument.

II

**[3]** Defendant next argues that the trial court erred in admitting the following testimony by Detective Conner:

Q. After you finished preparing the Defendant for transport, what conversation, if any, transpired between you and the Defendant?

A. Mr. Capers stated that we should have waited until twelve midnight, that we were early. I stated that if we would have waited until twelve midnight that we would have been late, and he said that, yeah, I would have been gone and you would have never saw me again.

Defendant argues that his statement to Detective Conner should have been excluded as either irrelevant or unfairly prejudicial pursuant to Rule 403 of the Rules of Evidence.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401. Although we review a trial court's ruling on the relevance of evidence *de novo*, we give a trial court's relevancy rulings "great deference on appeal." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *appeal dismissed and disc. review denied*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 121 L. Ed. 2d 241, 113 S. Ct. 321 (1992).

" 'In order to be relevant, . . . evidence need not bear directly on the question in issue if it is helpful to understand the conduct of the parties, their motives, or if it reasonably allows the jury to draw an inference as to a disputed fact.' " *State v. Miller*, 197 N.C. App. 78, 86, 676 S.E.2d 546, 551 (quoting *State v. Roper*, 328 N.C. 337, 356, 402 S.E.2d 600, 611, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232, 112 S. Ct. 280 (1991)), *disc. review denied*, 363 N.C. 586, 683 S.E.2d 216 (2009). " 'The value of the evidence need only be slight.' " *Id.*, 676 S.E.2d at 551-52 (quoting *Roper*, 328 N.C. at 355, 402 S.E.2d at 610).

Defendant acknowledges that evidence of actual flight by a defendant is admissible evidence of guilt. *See State v. Rainey*, 198 N.C. App. 427, 439, 680 S.E.2d 760, 770 (" 'North Carolina has long followed the rule that an accused's flight from a crime shortly after its commission is admissible as evidence of guilt.' " (quoting *State v. Self*, 280 N.C. 665, 672, 187 S.E.2d 93, 97 (1972))), *appeal dismissed*

*and disc. review denied,* 363 N.C. 661, 686 S.E.2d 903 (2009). Defendant argues, however, that his statement was not relevant since it was "an empty boast by a shackled man" rather than evidence of actual flight.

This argument overlooks the rationale underlying the admission of evidence of flight: "Evidence of flight does not create a presumption of guilt, but is to be considered with other factors in deciding whether the circumstances '*amount to an admission of guilt or reflect a consciousness of guilt.*'." *Id.* (emphasis added) (quoting *State v. Lampkins,* 283 N.C. 520, 523, 196 S.E.2d 697, 698 (1973)). *See also State v. Myers,* 309 N.C. 78, 87, 305 S.E.2d 506, 511 (1983) ("Our research discloses that 'consciousness of guilt' may be established, *inter alia,* by evidence of flight on the part of an accused."). As our Supreme Court has observed, flight is only one form of post-crime evidence considered admissible as showing a consciousness of guilt. *See id.* at 87 & n.2, 305 S.E.2d at 511 & n.2 (noting that evidence of falsehoods, escape, attempted suicide, and attempts to bribe "may also be evidence of implied admissions or consciousness of guilt").

The Supreme Court has also held that "[d]etails concerning a defendant's arrest may be relevant to prove a number of facts, including defendant's knowledge of his own guilt." *State v. Mason,* 337 N.C. 165, 172, 446 S.E.2d 58, 62 (1994). This Court has similarly concluded that a defendant's statements prior to arrest about wanting to avoid returning to prison "could be reasonably viewed as an acknowledgment of guilt" and, therefore, are relevant. *State v. Locklear,* 180 N.C. App. 115, 122, 636 S.E.2d 284, 288 (2006). *See also Straight v. State,* 397 So.2d 903, 908 (Fla.) ("When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, *or other indications after the fact of a desire to evade prosecution,* such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." (emphasis added)), *cert. denied,* 454 U.S. 1022, 70 L. Ed. 2d 418, 102 S. Ct. 556 (1981).

In these cases, the focus is on the defendant's state of mind—the evidence suggests a guilty mind and, therefore, is an implied admission by the defendant of his guilt. Defendant's statement in this case has the same effect. A jury could reasonably find that this statement—indicating that defendant would have fled if he had had the opportunity—was an implicit admission of guilt by defendant. As

such, the statement was relevant. *See also State v. Bagley*, 183 N.C. App. 514, 521, 644 S.E.2d 615, 620 (2007) (explaining that "evidence of flight is admissible if offered for the purpose of showing defendant's guilty conscience as circumstantial evidence of guilt of the crime for which he is being tried").

**[4]** Defendant, however, further argues that any probative value of this evidence was outweighed by its prejudicial effect in violation of Rule 403. "Whether to exclude evidence [under Rule 403] is a decision within the trial court's discretion." *State v. Al-Bayyinah*, 359 N.C. 741, 747, 616 S.E.2d 500, 506 (2005), *cert.denied*, 547 U.S. 1076, 164 L. Ed. 2d 528, 126 S. Ct. 1784 (2006). In *Rainey*, 198 N.C. App. at 433, 680 S.E.2d at 766 (internal citations and quotation marks omitted), this Court explained:

> While all evidence offered against a party involves some prejudicial effect, the fact that evidence is prejudicial does not mean that it is necessarily unfairly prejudicial. The meaning of unfair prejudice in the context of Rule 403 is an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.

Defendant contends the statement in this case was more prejudicial than probative because the jurors were not informed that defendant had just completed his sentence in New York and would have been released at midnight. According to defendant, in the absence of this additional information, the jury must have assumed that defendant was talking about escaping from jail. Defendant ignores the fact, however, that defendant objected to any testimony that he was incarcerated on unrelated charges in New York. Thus, the prejudice cited on appeal was due to defendant's trial strategy. In light of this trial strategy, we cannot hold that the trial court's decision to admit this evidence was an abuse of discretion. *See also State v. Charles*, 92 N.C. App. 430, 435-36, 374 S.E.2d 658, 661 (1988) (holding defendant's statement " 'they are never going to take me in again alive' " relevant as probative of defendant's knowledge of guilt and not unduly prejudicial), *disc. review denied*, 324 N.C. 338, 378 S.E.2d 800 (1989). We, therefore, conclude that the trial court did not err in admitting testimony regarding defendant's statement.

### III

**[5]** Finally, defendant challenges the trial court's admission of testimony by Derrick Goodson's mother, Vickie Hamrick, that Goodson

told her defendant had shot him. Defendant asserts that the testimony constituted inadmissible hearsay and violated his constitutional right to confrontation. Since defendant makes no specific argument and cites no supporting authority as to his confrontation clause contention, we do not address that issue. *See* N.C.R. App. P. 28(b)(6) ("Assignments of error . . . in support of which no reason or argument is stated or authority cited, will be taken as abandoned.").[2]

Following voir dire, the trial court found that Goodson arrived at the hospital at 1:13 a.m. after being shot. During transport, he received oxygen and saline through an I.V., but no other medications. Goodson was seen at 1:16 a.m. by an emergency room physician, whose notes (1) indicated that Goodson was oriented in conversation and gave appropriate responses and (2) did not indicate that anything was done that would affect Goodson's ability to think and evaluate.

Hamrick was at work when she learned her son was at the hospital. She went to work at midnight, and when she learned this news, she had been at work for approximately an hour. The drive to the hospital took about 25 minutes. When she arrived, Goodson told Hamrick that he had been shot by "C," a nickname that referred to defendant. Officer Deborah Garris talked to Goodson at approximately 2:02 a.m. in the hospital, and when she was talking to him, Goodson's parents were present.

The trial court concluded that Goodson's statement qualified as a present sense impression under Rule 803(1) of the Rules of Evidence because it "was made at a time when it was separated from the shooting only by the efforts of the EMT personnel, the emergency room, hospital emergency room nurses and doctors, and this on-going effort to save Mr. Goodson's life would therefore qualify as immediately after the shooting . . . ." The trial court, therefore, admitted Hamrick's testimony regarding her son's identification of his shooter.

A present sense impression, an exception to the rule against hearsay, is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." N.C.R. Evid. 803(1). The parties dispute whether Goodson's statement was made sufficiently near in time to the shooting to fall under this exception.

2. Although Rule 28 was recently amended, the amendment applies to cases appealed on or after 1 October 2009. Since this case was appealed in May 2009, we analyze this case under the version of Rule 28 applicable at that time.

" '[T]here is no rigid rule about how long is too long to be immediately thereafter.' " *State v. Little*, 191 N.C. App. 655, 664, 664 S.E.2d 432, 438 (quoting *State v. Clark*, 128 N.C. App. 722, 725, 496 S.E.2d 604, 606 (1998)), *disc. review denied*, 362 N.C. 685, 671 S.E.2d 326 (2008). " '[T]he basis of the present sense impression exception is that closeness in time between the event and the declarant's statement reduces the likelihood of deliberate or conscious misrepresentation.' " *Id.* (quoting *State v. Smith*, 152 N.C. App. 29, 36, 566 S.E.2d 793, 798, *cert. denied*, 356 N.C. 311, 571 S.E.2d 208 (2002)).

In this case, the State's evidence was that Goodson was shot just before 12:49 a.m. and was admitted to the hospital at 1:13 a.m. His mother got a call informing her of the shooting at approximately 1:00 a.m. She immediately left work, and the evidence suggests she arrived at the hospital at approximately 1:30 a.m. Once she arrived at the hospital, she went straight to the emergency room, where Goodson made the statement. At that time, Goodson was crying and kept repeating that defendant had shot him. Goodson was at that time with a doctor who had responded to his bedside at 1:40 a.m. This evidence supports a finding that Goodson made his statement approximately 50 minutes after the shooting.[3]

We believe the time period between the shooting and when Goodson made the statement—less than an hour—was sufficiently brief under the circumstances to fall under the present sense impression exception. The focus of events during that gap in time was on saving Goodson's life, thereby reducing the likelihood of deliberate or conscious misrepresentation. *See State v. Cummings*, 326 N.C. 298, 314, 389 S.E.2d 66, 75 (1990) (finding admissible as present sense impression victim's mother's testimony that victim came to mother's house crying and stated that defendant had kicked her out of house, even though statement was made after victim drove from defendant's house in Willow Springs to her mother's house in Raleigh). *Compare State v. Wiggins*, 159 N.C. App. 252, 257, 584 S.E.2d 303, 309 (holding statements not admissible where victim made them when he woke up from surgery, seven hours after shooting), *disc. review denied*, 357 N.C. 511, 588 S.E.2d 472 (2003), *cert.denied*, 541 U.S. 910, 158 L. Ed. 2d 256, 124 S. Ct. 1617 (2004).

**[6]** Defendant also points out that the trial court refused to admit the portion of Goodson's statement to his mother in which Goodson said

---

3. Hamrick testified that no more than an hour had elapsed from the phone call she received until the time when she spoke with her son.

defendant shot Roseboro. Defendant argues that because the court found that portion of the statement was not credible, the second portion of the statement, in which Goodson told Hamrick that defendant shot him, should also be inadmissible. Defendant misconstrues the reason for the trial court's exclusion of the first portion of the statement. The trial court excluded the first portion not because the court thought it lacked credibility, but because it was obvious that Goodson, who was in a different part of the apartment complex when Roseboro was shot, could not have had personal knowledge of who shot Roseboro. The exclusion of the first portion of the statement has no bearing on the admissibility of the second portion. We, therefore, find no error.

No error.

Judges JACKSON and BEASLEY concur.