STATE OF NORTH CAROLINA v. LAWRENCE LEE ASH

No. COA04-623

(Filed 19 April 2005)

### 1. Confessions and Incriminating Statements— motion to suppress—videotape of interrogation—right to counsel—right to remain silent

The trial court did not err in a first-degree murder and conspiracy to commit robbery with a dangerous weapon case by denying defendant's motion to suppress the videotape of his interrogation by a detective which he contends denied his rights to counsel and to remain silent, because: (1) defendant was informed of his right to counsel and subsequently voluntarily waived his right to counsel by signing a waiver form; (2) defendant indicated his desire to answer questions without a lawyer being present and his desire to waive his rights by initialing the rights form in the proper place; (3) defendant failed to unambiguously invoke his right to remain silent; and (4) assuming arguendo that the trial court erred, the error was harmless beyond a reasonable doubt when the State presented overwhelming evidence of defendant's guilt including the testimony of two witnesses, and further, defendant failed to object during a detective's testimony regarding defendant's confession and statements made to the detective which are consistent with the videotape.

### 2. Criminal Law— removal of defendant from courtroom during trial—restraint of defendant at trial

The trial court did not err in a first-degree murder and conspiracy to commit robbery with a dangerous weapon case by restraining and removing defendant from the courtroom during trial, because: (1) defendant has a right to be present during each stage of his trial, but in a noncapital case, may waive that right through disruptive behavior; (2) the transcript revealed numerous outbursts by defendant during jury selection; (3) the trial court followed the requirement of N.C.G.S. § 15A-1032(b)(1) and defendant waived the instruction required under N.C.G.S. § 15A-1032(b)(2); (4) defendant failed to object to his restraint at trial and thus waived appellate review of this argument; and (5) N.C.G.S. § 15A-1031 allows the trial court to order a defendant to be subjected to physical restraint in the courtroom when it is rea-

sonably necessary to maintain order, prevent defendant's escape, or to provide for the safety of persons.

**3. Constitutional Law— right of confrontation—videotaped deposition—unavailable witness—harmless error**

Although the trial court violated defendant's constitutional right of confrontation in a first-degree murder and conspiracy to commit robbery with a dangerous weapon case by admitting a doctor's videotaped deposition into evidence without hearing evidence regarding the doctor's unavailability, the error was harmless because excluding the deposition testimony, the State presented other overwhelming evidence from which the jury could find that the victim died from injuries caused by a shotgun wound to the chest and that defendant fired the shotgun inflicting the wound.

Appeal by defendant from judgments entered 17 November 2003 by Judge James Floyd Ammons, Jr., in Cumberland County Superior Court. Heard in the Court of Appeals 2 February 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Amy C. Kunstling, for the State.*

*Daniel Shatz, for defendant-appellant.*

TYSON, Judge.

Lawrence Lee Ash ("defendant") appeals from judgments entered after a jury found him to be guilty of first-degree murder pursuant to the felony murder rule, conspiracy to commit robbery with a dangerous weapon, and attempted robbery with a dangerous weapon. The trial court arrested judgment on the conviction of attempted robbery. We find error at trial but hold such error was harmless beyond a reasonable doubt.

## I. Background

Jonathan Pruey ("Pruey") and his wife Jennifer lived in a mobile home in Cumberland County. Pruey stored marijuana in his bedroom and sold it out of his mobile home. In June 2000, two males, Corrie Cordier ("Cordier") and "Chris" were residing at Pruey's home.

### A. Cordier's Testimony

Around 10:30 p.m. on 27 June 2000, Cordier heard a knock at the front door. Pruey looked out the window and asked Cordier to illu-

minate the front porch lights. Cordier observed two people dressed in all black clothing huddling in the corner of the porch. One of the men was wearing a "Jason mask," which Cordier described as a white hockey mask with small black lines, and brandishing a long metallic object, which appeared to Cordier to be a baseball bat.

Cordier stepped away from the door and yelled to Pruey. The door swung open, and the individual wearing the "Jason mask" fell through the partially-opened door. Cordier kicked the masked man as Pruey closed the door. A few seconds later, Cordier heard a loud "noise." Pruey's wife turned on some lights and observed Cordier with blood on his side. After "Chris" turned on more lights, Cordier and Pruey's wife observed Pruey lying "spread-eagled" on the floor between the kitchen and the living room bleeding profusely. Cordier attempted to administer first aid to Pruey, while "Chris" took Pruey's wife, who became hysterical, next door to Michael Grimes's ("Grimes") home.

## B. Grimes's Testimony

Grimes testified that shortly before 10:30 p.m. on 27 June 2000, he heard a "slamming" noise, a shotgun blast, and someone screaming. He went outside and observed a car accelerating past Pruey's mobile home. Grimes could not identify the tag number, but noticed the car's headlights were not activated until after it reached Cumberland Road. Grimes returned inside his home and called 911.

## C. Deputy Porter's Testimony

Cumberland County Deputy Sheriff Jennifer Porter ("Deputy Porter") was the first officer to arrive at the scene. Deputy Porter testified she spoke with Grimes and Cordier upon arrival. Deputy Porter found Pruey to have a faint pulse and called the 911 dispatcher regarding Pruey's condition. Emergency medical services personnel and other officers arrived and assumed the investigation.

Investigators processing the scene found a mask identified by Cordier as the "Jason mask" worn by one of the perpetrators. The mask was found on the dirt road leading from Pruey's mobile home to Cumberland Road next to tire impressions and a nylon rag. The police attempted unsuccessfully to cast a mold of the tire impressions.

Investigators collected fingerprints, but were unable to gather any useful fingerprints from the front door or the mask. Inside Pruey's home, officers recovered a shotgun shell wadding from the

kitchen floor, and removed and collected a portion of the front door containing the hole from the gun shot. Officers also recovered a metal box containing money and "green vegetable matter."

### D.  B.G.'s Testimony

B.G. testified that in June 2000 she was a fifteen-year-old runaway and lived with a man named "Kenny" in the Sunset Trailer Park along with her boyfriend, Craig Wissink ("Wissink") and defendant. Defendant was B.G.'s "ex-boyfriend." Approximately one week prior to 27 June 2000, B.G. observed a male named "Shawn" give Wissink a shotgun. Prior to the attempted robbery and murder, she heard Wissink and Damian Jackson ("Jackson") discuss plans to rob someone.

Around 4:00 p.m. on 27 June 2000, B.G. visited Victoria Lawson's ("Lawson") mobile home. B.G. testified that Wissink and defendant came by Lawson's home around 7:00 p.m. Wissink told B.G. to stay where she could be found. At about 10:45 p.m., she received a call at Lawson's home from Wissink, who told her to return to Kenny's mobile home alone. Upon arrival, Wissink informed B.G. he was leaving town and, if she wanted to accompany him, she should pack her things. After gathering her belongings, B.G. and Wissink left town, stopping along the way for Wissink to speak with Jackson.

B.G. and Wissink traveled to Wissink's mother's home in Kingman, Arizona, where they were subsequently arrested. Wissink carried a shotgun with them. This gun was identified by B.G. as the same gun State Bureau of Investigation Agent Ronald Marrs ("Agent Marrs") had earlier identified as the murder weapon during his testimony.

B.G. was charged with accessory after the fact to murder and entered into a plea agreement with the State. In exchange for her testimony, her charges were retained in juvenile court and she was not bound over for trial as an adult.

### E.  C.P.'s Testimony

C.P. testified that on 27 June 2000, he lived with his mother in Sunset Trailer Park and knew both Wissink and defendant. That morning, he was present with Wissink and defendant when Wissink stated that he was planning to rob a drug dealer on Cumberland Road to get money so he and B.G. could leave town. According to C.P., defendant stated that he also needed money, but did not say anything

about participating in Wissink's planned robbery. While Wissink was discussing the robbery, C.P. observed a twenty-gauge shotgun and a "Jason mask" similar to the one later identified by Cordier and recovered near the scene.

C.P. testified that during the day after the robbery, defendant confessed that he and Wissink had been the perpetrators and that he had shot Pruey. Defendant informed C.P. that he and Wissink drove to Pruey's home in C.P.'s mother's car, parked the car, and approached the front door. Defendant stated he was wearing the "Jason mask" and dark gloves, and Wissink was wearing a green camouflage mask. After Wissink knocked on the door, defendant attempted to kick in the door. Defendant observed a man kick Wissink in the face. Wissink stood up, and the door closed. Defendant confessed to C.P. that he shot through the door one time.

According to C.P., defendant suggested that C.P. call the police to report that Wissink committed the offense and that they would split the reward money. C.P. contacted the police and informed them that Wissink committed the offenses. C.P. did not mention defendant's involvement, but stated that someone named "Miko" had committed the crimes with Wissink that night. C.P. admitted "Miko" was a fake name.

On 29 June 2000, C.P. informed police that both Wissink and defendant had committed the offense. C.P. was charged with multiple felony charges and entered into a plea agreement. In exchange for his testimony, he received a reduction of two armed robbery charges to common law robbery, dismissal of other charges, and was sentenced to ten to twelve months imprisonment followed by probation.

### F. Defendant's Arrest and Statements

On 29 June 2000, defendant was arrested and interrogated over two and one-half hours by Detective Sterling McClain ("Detective McClain"). The interrogation was videotaped. Prior to trial, defendant moved to suppress the videotape of the interrogation. The trial court denied this motion and played portions of the videotape for the jury. On the videotape, defendant initially denied any involvement but later confessed he and Wissink went to Pruey's mobile home and attempted to enter it. Defendant stated that he was attempting to get Wissink to leave when Wissink fired the shotgun.

Detective McClain acknowledged that during the interrogation he lied to defendant about finding defendant's: (1) fingerprints and his

blood on the mask; (2) hair fibers; and (3) shoes in a lake. Detective McClain also falsely informed defendant that Wissink had been arrested and had implicated defendant. Detective McClain testified that falsehoods or deceptions are an interrogation "technique" or "tactic" commonly used by investigators.

Over defendant's objections, the State also introduced a video-taped deposition of Dr. Kenneth Lidonnici ("Dr. Lidonnici"). Dr. Lidonnici testified that an autopsy revealed a large hole and three smaller holes in Pruey's chest. Internal examination showed Pruey died from a gunshot wound to the chest. Dr. Lidonnici testified he removed three projectiles, some shotgun shell "wadding," and some white "plastic sphere[s]" from Pruey's body. Agent Marrs later testified that shell wadding recovered at the scene and from Dr. Lidonnici was consistent with shells found in a 20 gauge shotgun recovered from Wissink. The white plastic styrofoam balls recovered from Pruey by Dr. Lidonnici were consistent with the material inside Pruey's front door.

Defendant did not testify or present any evidence. The jury found him to be guilty of first-degree murder, conspiracy to commit armed robbery, and attempted armed robbery. After arresting judgment on the attempted armed robbery conviction, the trial court sentenced defendant to life-imprisonment without parole for the murder conviction and twenty-nine to forty-four months for the conspiracy conviction, to run consecutive to the life sentence. Defendant appeals.

## II. Issues

Defendant argues the trial court erred by: (1) denying defendant's motion to suppress the videotape of his interrogation; (2) restraining and removing defendant from the courtroom during trial; and (3) admitting Dr. Lidonnici's videotaped deposition into evidence.

## III. Motion to Suppress

[1] Defendant contends the trial court erred by denying his motion to suppress the videotape of his interrogation by Detective McClain and argues he was denied his rights to counsel and to remain silent. We disagree.

Defendant's motion to suppress was heard and denied on 15 August 2003. Contrary to the State's argument that defendant failed to renew his objection, defense counsel sufficiently preserved this assignment of error for review on appeal. Upon the State's tender of

the videotape at trial, defense counsel renewed his objection to "what's been previously ruled on" and preserved the issue for appellate review.

### A. Right to Counsel

It is well-settled that "during a custodial interrogation, if the accused invokes his right to counsel, the interrogation must cease and cannot be resumed without an attorney being present *'unless the accused himself initiates further communication, exchanges, or conversations with the police.'* " *State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386 (1981)) (other citations omitted) (emphasis in original), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001), *cert. denied*, 358 N.C. 157, 593 S.E.2d 84 (2003).

> A trial court is to make an initial determination as to whether a defendant waived his/her right to counsel. Those findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. Conclusions of law which are supported by findings of fact are binding on appeal. Further, the trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found.

*Golphin*, 352 N.C. at 409, 533 S.E.2d at 201 (internal quotations and citations omitted). "The question is whether the suspect " 'articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " *Id.* at 450, 533 S.E.2d at 225 (alteration in original) (quoting *Davis v. United States*, 512 U.S. 452, 459, 129 L. Ed. 2d 362, 371 (1994)). In *Davis*, the United States Supreme Court held, "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis*, 512 U.S. at 461-62, 129 L. Ed. 2d at 373. The Supreme Court explained the requirement.

> We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. Full comprehension of the rights

to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—*it is one that must be affirmatively invoked by the suspect.*

*Id.* at 460-61, 129 L. Ed. 2d at 372 (emphasis supplied) (internal citations and quotations omitted). The Supreme Court ruled the statement, "Maybe I should talk to a lawyer," was ambiguous and insufficient to require termination of the interrogation. *Id.* at 462, 129 L. Ed. 2d at 373.

In *State v. Hyatt,* our Supreme Court ruled that the defendant did not "unambiguously convey [his] desire to receive the assistance of . . . counsel" and "invoke his Fifth Amendment right to counsel" when he stated to two police officers that his father wanted a lawyer to be present during the interrogation. 355 N.C. 642, 656, 566 S.E.2d 61, 71 (2002), *cert. denied,* 537 U.S. 1133, 154 L. Ed. 2d 823 (2003), *cert. denied,* 359 N.C. 284, 610 S.E.2d 382 (2005). Further, the *Hyatt* Court explained, "[d]efendant's willingness to speak to [the officers] unassisted by counsel after having his *Miranda* rights read to him, printed out for his review, and explained to him upon his ambiguous utterances regarding his father's wishes constituted a waiver of defendant's Fifth Amendment rights." 355 N.C. at 657, 566 S.E.2d at 71. The Court relied on language from *Davis,* 512 U.S. at 460, 129 L. Ed. 2d at 372, which states:

'[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process,' and '[a] suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted.'

*Hyatt,* 355 N.C. at 657, 566 S.E.2d at 71 (internal quotation omitted and alteration in original).

Defendant contends the trial court erred by denying his motion to suppress and argues he invoked his right to counsel during the interrogation. Defendant admits being advised of his rights prior to

interrogation, but argues the trial court erred by finding that he "did not . . . ever ask to talk to an attorney." After being advised of his right to have an attorney present, defendant asked, "Now?" Detective McClain responded affirmatively. Defendant then asked, "Where's my lawyer at? [Inaudible] come down here?" Detective McClain replied that the lawyer who was representing defendant on a pending, but unrelated, breaking and entering charge had nothing to do "with what [he was] going to talk to [defendant] about." Defendant responded, "Oh, okay," and signed the waiver of rights form.

Although defendant carries the burden of unequivocally asserting his right to counsel, *see Davis*, 512 U.S. at 461-62, 129 L. Ed. 2d at 372-73, "the State has the burden of establishing by a preponderance of the evidence that the defendant voluntarily waived the rights afforded to [him] under *Miranda*, and that the voluntariness of a waiver is to be determined by the totality of the circumstances." *State v. Strobel*, 164 N.C. App. 310, 317, 596 S.E.2d 249, 255 (2004) (citations omitted), *appeal dismissed and disc. rev. denied*, 359 N.C. 286, 610 S.E.2d 712 (2005). Here, defendant was informed of his right to counsel and subsequently voluntarily waived his right to counsel by signing the waiver form. See *Hyatt*, 355 N.C. at 657, 566 S.E.2d at 71. Substantial evidence supports the trial court's finding that defendant did not "ask to talk to an attorney." *See State v. Barnes*, 154 N.C. App. 111, 115, 572 S.E.2d 165, 168 (2002) (this Court may not set aside or modify findings in an order denying a motion to suppress if the findings are substantiated by evidence, even if conflicting evidence exists), *disc. rev. denied*, 356 N.C. 679, 577 S.E.2d 892 (2003). The trial court further found "defendant indicated his desire to answer questions without a lawyer being present and his desire to waive his rights . . . by initialing the rights form in the proper place." Defendant does not assign error to or contest this finding. Defendant has failed to show the trial court's findings do not support its conclusion that "defendant never made a clear and unequivocal assertion of his Right to Counsel . . . ."

The trial court's order sufficiently shows defendant's statements were not "an unambiguous and unequivocal request for counsel." *Davis*, 512 U.S. at 461-62, 129 L. Ed. 2d at 373. This assignment of error is overruled.

## B. Right to Remain Silent

Defendant also argues he invoked his right to remain silent during the interrogation.

In *Golphin,* our Supreme Court held, "[b]ecause [the defendant] did not *unambiguously invoke* his right to remain silent, the trial court did not err in admitting the portion of his statement . . . ." 352 N.C. at 451-52, 533 S.E.2d at 225 (emphasis supplied).

During the interrogation by Detective McClain, defendant confessed that he and others had planned to do a robbery, but ended their plan when they drove by the mobile home and observed all the interior lights illuminated in Pruey's home. After Detective McClain asked defendant whether he was "scared" when the gun "went off," defendant stated, "I don't want to talk no more 'cause you're talking some crazy s—t now." Detective McClain continued to question defendant, stating, "You didn't even know how many people was [sic] in the house, did you?" Defendant responded, "That's why the f—k I didn't stop," and the interrogation continued. Defendant continued to deny his involvement in the crime, but admitted his participation after further questioning.

The trial court found, "Notwithstanding this statement, [defendant] continued to talk without significant prompting by the officer. . . . [T]he court is unconvinced that the defendant clearly and unequivocally asserted his right to remain silent." Substantial evidence supports this finding and satisfies the *Golphin* test that defendant failed to "unambiguously invoke his right to remain silent." *Id.* at 451-52, 533 S.E.2d at 225. This assignment of error is overruled.

Accepting defendant's argument that the trial court erred by denying his motion to suppress and admitting the videotape of defendant's statements made to Detective McClain, this error is harmless beyond a reasonable doubt. The State presented other overwhelming evidence of defendant's guilt, including the testimony of B.G. and C.P. *See State v. Atkins,* 58 N.C. App. 146, 292 S.E.2d 744 (overwhelming evidence of the defendant's guilt qualifies error as harmless since it could not have affected the outcome), *cert. denied and appeal dismissed,* 306 N.C. 744, 295 S.E.2d 480 (1982).

Further, defendant failed to object during Detective McClain's testimony regarding defendant's confession and statements made to Detective McClain, which are consistent with the videotape. *State v. Wiggins,* 159 N.C. App. 252, 584 S.E.2d 303 (harmless error in the admission of the victim's written statements because the recorded 911 call and witnesses' testimony duplicated the victim's written statements), *disc. rev. denied,* 357 N.C. 511, 588 S.E.2d 472 (2003), *cert. denied,* 541 U.S. 910, 158 L. Ed. 2d 256, *reh'g denied,*

541 U.S. 1038, 158 L. Ed. 2d 726 (2004). This assignment of error is overruled.

## IV. Restraint and Removal from Courtroom

**[2]** Defendant argues the trial court erred by restraining him and removing him from the courtroom. We disagree.

The transcript included in the record on appeal reveals numerous outbursts by defendant during jury selection. He accused jurors of lying, blurted out questions, cursed, babbled, sucked his thumb, and sang. Two jurors were excused for cause because they felt they could not be fair and impartial in light of defendant's disruptive behavior at trial.

The trial court recessed the proceedings and, outside the presence of the jury, stated that trial would resume the next day in the video courtroom, with defendant present in the adjoining judge's chambers. The trial court instructed the bailiff to employ whatever security measures were necessary, including restraining defendant. The trial court informed defendant's two attorneys that one attorney would remain with defendant and the other would be present in the courtroom. The trial court assured the defense attorneys of ample time to confer during trial and allow them to switch places as needed to cross-examine different witnesses.

### A. Removal from the Courtroom

Defense counsel objected to defendant's removal from the courtroom. Under this Court's holding in *State v. Reid*, defendant has a right to be present during each stage of his trial, but, in a non-capital case, may waive that right through disruptive behavior. 151 N.C. App. 379, 386-87, 565 S.E.2d 747, 753 (citing *State v. Miller*, 146 N.C. App. 494, 499-500, 553 S.E.2d 410, 414 (2001), *appeal dismissed and disc. rev. denied*, 356 N.C. 622, 575 S.E.2d 522 (2002). N.C. Gen. Stat. § 15A-1032(a) (2003) authorizes the trial court to remove a defendant from the courtroom if the defendant's conduct is "so disruptive that the trial cannot proceed in an orderly manner." In doing so, the trial court is required to set forth an explanation on the record for the reasons to remove defendant and instruct the jury that removal is not to be a factor in weighing the evidence or determining his guilt. N.C. Gen. Stat. § 15A-1032(b)(1)-(2) (2003).

After removing defendant from the courtroom, the trial court stated,

He has been a little bit disruptive from the beginning, although he was on fairly good behavior, particularly when he wouldn't talk to anybody. But he began to curse and speak when he wasn't supposed to and speak out of turn. Wouldn't be quiet when I asked him to and became disruptive to the point that defense counsel asked me to not inquire of the jury whether that would affect them or not. So that's why he's out of the courtroom, although he can see and hear us.

Defense counsel specifically waived the instruction required under N.C. Gen. Stat. § 15A-1032(b)(2) because they felt "it will just call more attention to the fact that he's not here." The trial court followed the requirement of N.C. Gen. Stat. § 15A-1032(b)(1) and defendant waived the instruction under N.C. Gen. Stat. § 15(A)-1032(b)(2). *See State v. Miller*, 146 N.C. App. 494, 553 S.E.2d 410 (2001). This assignment of error is dismissed.

### B.  Defendant's Restraint at Trial

Defendant did not object to his restraint at trial and has waived appellate review of this argument. *See State v. Thomas*, 134 N.C. App. 560, 568, 518 S.E.2d 222, 228 (" 'failure to object to the shackling, . . . waive[s] any error which may have been committed' ") (quoting *State v. Tolley*, 290 N.C. 349, 369, 226 S.E.2d 353, 370 (1976)), *appeal dismissed and cert. denied*, 351 N.C. 119, 541 S.E.2d 468 (1999). Further, under N.C. Gen. Stat. § 15A-1031 (2003), "A trial judge may order a defendant or witness subjected to physical restraint in the courtroom when the judge finds the restraint to be reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons." This assignment of error is overruled.

### V.  Deposition Testimony

[3] Defendant argues his constitutional right of confrontation was violated in the trial court's admission of a videotaped deposition of Dr. Lidonicci. We hold that any error was harmless beyond a reasonable doubt.

"Our review of whether defendant's Sixth Amendment right of confrontation was violated is three-fold: (1) whether the evidence admitted was testimonial in nature; (2) whether the trial court properly ruled the declarant was unavailable; and (3) whether defendant had an opportunity to cross-examine the declarant." *State v. Clark*, 165 N.C. App. 279, 283, 598 S.E.2d 213, 217 (citing *Crawford v.*

*Washington*, 541 U.S. 36, 54, 158 L. Ed. 2d 177, 203 (2004)), *disc. rev. denied*, 358 N.C. 734, 601 S.E.2d 866, *appeal dismissed*, 359 N.C. 192, 607 S.E.2d 651 (2004).

It is undisputed that Dr. Lidonicci's deposition was testimonial in nature and defendant had an opportunity, which he availed himself of, to cross-examine Dr. Lidonicci during the deposition. The trial court failed to hear evidence to support or enter a finding of fact regarding Dr. Lidonicci's unavailability. *Clark*, 165 N.C. App. at 285-86, 598 S.E.2d at 218-19 (citing *State v. Nobles*, 357 N.C. 433, 439, 584 S.E.2d 765, 770 (2003)). Prior to playing the videotape, the trial court informed the jury, "For the convenience of the doctor you are about to see testify, we did this last week. . . ." This statement in the record is insufficient under *Clark* and *Nobles* to establish unavailability. Without receiving evidence on or making a finding of unavailability, the trial court erred in admitting Dr. Lidonicci's deposition.

As defendant's constitutional right was violated through the admission of Dr. Lidonicci's deposition, "the State has the burden of proving the error was harmless beyond a reasonable doubt to sustain defendant's conviction." *Clark*, 165 N.C. App. at 289, 598 S.E.2d at 220. Defendant argues the trial court's error in admitting the deposition testimony requires a new trial because no other evidence establishes Pruey's death and the cause of his death. We disagree.

Cordier testified that after he heard a loud bang, Pruey's wife turned on the lights and he saw Pruey lying on the floor bleeding profusely from his chest. Grimes testified that Pruey had a large, bleeding hole in his chest and "looked dead." Deputy Porter testified Pruey was lying on the floor in a pool of blood when she arrived on the scene. Upon arrival at the scene, Detective McClain was informed by Deputy Porter that Pruey was dead. The State presented photographs to the jury showing Pruey's body lying on the floor and his chest wound. Agent Marrs testified the shotgun was fired at a slight angle within inches of the front door to the mobile home. Defendant confessed to Detective McClain that he fired the shotgun through the front door.

Excluding the deposition testimony, the State presented other overwhelming evidence from which the jury could find that Pruey died from injuries caused by a shotgun wound to the chest and that defendant fired the shotgun inflicting the wound. Any error in admitting Dr. Lidonnici's deposition testimony is harmless beyond a reasonable doubt.

IN RE B.P., S.P., R.T.

[169 N.C. App. 728 (2005)]

VI. Conclusion

The trial court did not err in denying defendant's motion to suppress the videotape of his interrogation. The trial court did not err in restraining defendant and removing him from the courtroom due to his disruptive behavior. The trial court erred in admitting the deposition testimony of Dr. Lidonnici without entering a finding of fact that Dr. Lidonnici was unavailable to testify. However, any error was harmless beyond a reasonable doubt in light of the other overwhelming evidence of defendant's guilt from which the jury could find Pruey died from a shotgun blast and defendant fired the gun inflicting the wound.

Harmless Error.

Judges McGEE and GEER concur.